MARIO MERCADO E HIJOS, Petitioner, *v.* PUERTO RICO SUGAR BOARD, Respondent. SUGAR PRODUCERS' ASSOCIATION, ETC., Petitioners, *v.* PUERTO RICO SUGAR BOARD, Respondent. CENTRALES CAMBALACHE and PLAZUELA (PUERTO RICO LAND AUTHORITY), Petitioners, *v.* PUERTO RICO SUGAR BOARD, Respondent.

Nos. JA-66-1,        Decided March 27, 1968.
JA-66-2,
JA-66-3.

*Pedro M. Porrata* and *Charles R. Cuprill* for Mario Mercado e Hijos. *Fiddler, González & Rodríguez, Miguel Hernández Colón, Francisco M. Susoni, Pablo Cancio,* and *Salvador E. Casellas* for the Sugar Producers' Association. *McConnell, Valdés & Kelley* and *Ramón Morán Loubriel* for C. Brewer Puerto Rico, Inc. *Eduardo Díaz Porto* for Central San Vi-

cente, Inc. and the Sugar Producers' Association. *José Alberty Orona, Miguel A. Gierbolini Febus,. Daniel A.. Cabán Castro, Margarita García Santiago,* and *Juan Marín Hernández* for Centrales Cambalache and Plazuela. *Lydia F. Marcos* for respondent. *J. B. Fernández Badillo, Solicitor General,* and *Adaljisa Díaz Collazo, Assistant Solicitor General,* for the Commonwealth of Puerto Rico.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

The Sugar Producers' Association of Puerto Rico, Mario Mercado e Hijos, and the Land Authority, operators of sugar mills, challenge the decision of the Puerto Rico Sugar Board of July 21, 1965, ordering them to pay to the *colonos* the compensation for transportation and hauling corresponding to the grinding seasons of 1963 and 1964 without any limitation whatsoever by reason of the distance traveled, thereby eliminating the one-dollar maximum which had prevailed by law until then. According to the estimate of the Board, it represents an additional payment of $836,031.58 by the centrals for the 1963 grinding season and approximately $809,565 for 1964.

I

In 1951 when the Sugar Act of Puerto Rico, Act No. 426 of May 13, 1951 (Sess. Laws, p. 1138), was approved, the Legislature specifically established in § 6 the conditions for the transportation and hauling of the *colono's* sugarcane. In the event that the central did not provide such means of transportation from the *colono's* farm to the central it provided that:

"(b) In those cases where the *colono* transports his cane, the central shall compensate him at the basic rate of fifteen (15) cents for each ton of cane transported, as hauling expenses, plus the sum of five (5) cents for each ton per kilometer, from the farm to the point of delivery, provided the distance to be covered from the farm to the point of delivery is one-half kilometer or more; *Provided,* That the *colono* shall be entitled

to receive the basic compensation of fifteen (15) cents even if the distance to be covered from the farm to the point of delivery is less than one-half kilometer. For the purpose of this compensation, the distance shall be determined from the normal or natural exit in the *colono's* farm where the cane was cut, to the point of delivery designated by the central. If upon determining the weight and the distance in the transportation and hauling of the cane, there results a fraction of a kilometer or of a ton, a proportional compensation shall in both cases be paid for such fraction."

As a limitation to the compensation which the central was bound to pay on this account, subdivision (e) stated that:

"(e)

In no case shall the central be under obligation to pay more than one dollar for transportation and hauling.
"

Eleven years later subdivision (e) of § 6, 5 L.P.R.A. § 375, was amended by Act No. 54 of June 19, 1962 (Sess. Laws, p. 120) eliminating the maximum amount of one dollar, and incorporating the provision copied below which transferred to the Sugar Board the power to establish the compensation for transportation and hauling:[1]

"Notwithstanding the provisions of this section, the Board may, after hearing the parties, increase the compensation fixed for transportation and hauling to be paid by the centrals to the *colono,* which compensation shall prevail, and the Board may likewise fix the maximum amount that in each case the central shall be under obligation to pay for transportation and hauling."

On March 25, 1964, the Sugar Board decided to hold public hearings for the purpose of considering a petition of

---

[1] In explaining the purpose of the law the Senate Committee on Agriculture informed that: "The purpose of this project is that the Board itself be in charge of dealing with the compensation to be paid to the *colonos* for the transportation and hauling of their cane. At the present time the compensation is fixed by law." 15-3 Journal of Proceedings 1147.

the Farmers' Association of Puerto Rico to increase the compensation for transportation and hauling paid to the *colonos* who personally perform the transportation of their cane from their farms to the place of delivery to the central, from 15 to 24 cents per ton of cane transported and from 5 to 8 cents for each ton of cane per kilometer covered.[2]

After several preliminary incidents which we need not recite here, the Sugar Producers' Association filed on May 18, 1964, a petition to fix the maximum amount of one dollar as the compensation to be paid to *colonos* for transportation and hauling. Said petition was considered jointly with that presented by the Farmers' Association. Several hearings were held during which the *colonos* as well as the centrals offered oral and documentary evidence.

On February 26, 1965, the Board entered an extensive decision denying the petition of the Farmers' Association of Puerto Rico on the ground that it had not been established that the *colonos*, although they had to pay higher costs for transportation, had received an inadequate pay for their cane or suffered losses or had insufficient profits as cane producers.[3]

As to the petition of the Sugar Producers' Association of Puerto Rico to fix a maximum compensation, the Board adopted Rule No. 11 fixing a maximum compensation of one dollar effective as of the grinding season of 1963.[4]

---

[2] Apparently the original petition of the Farmers' Association of Puerto Rico was made informally. Later it was filed in a written petition dated April 1, 1964.

[3] The test applied by the Board is stated as follows in its decision: "Summarizing, the Board must consider on an integral basis, whether or not it is proper to increase the compensation for transportation and hauling by determining whether the increase in the minimum participation of the *colonos* as a result of reductions in the shipment and marketing expenses and increase in the molasses bonus sets off the costs of transportation paid by the *colono* always considering that the central is not bound by law to cover the total cost of said transportation and even less in a direct manner."

[4] In its pertinent part the decision says:

Rule No. 11 was not approved by the Governor of Puerto Rico.[5] As a consequence thereof, the Sugar Board, by its decision of July 21, 1965, ordered the centrals to proceed to pay to the *colonos* the corresponding compensation for transportation and hauling for the past grinding seasons of 1963 and 1964, *without any limitation by reason of distance covered* and to file proof that they had paid the compensations in the manner indicated. The petitioner centrals immediately requested the reconsideration of this decision adducing, in substance, that (a) they were being deprived of their property without the due process of law because the application of said order was confiscatory, onerous, unreasonable, and arbitrary, not only as to the economic damages

"Act No. 54 of June 19, 1962, amended subdivision (e) of § 6 of the Sugar Act eliminating the maximum of $1 which the centrals should pay to the *colonos* as compensation for the hauling of their cane. The consideration of the effects of said amendment in its application to the 1963 grinding season is of special significance. The application of said Act to the 1963 grinding season results in an increase in compensation only to those *colonos* who transport their cane covering a distance of more than 17 kilometers. The increase, therefore, is not uniform and we have explained that Act No. 426 of 1951 requires the method of uniform shares for the *colonos*. It is not reasonable either because as distance increases, the costs of transportation necessarily decrease, since the fixed costs are distributed. Furthermore, § 3 of the Sugar Act (5 L.P.R.A. 372) imposes on the centrals the obligation to grind the cane of the *colonos* and they cannot refuse to do it because the distance from the farm of origin results in a more onerous condition. (*Plata Sugar Co., Inc.* v. *Sugar Board,* 82 P.R.R. 833.) Before the amendment, the distance of more than 17 kilometers could not increase the minimum of $1 per ton-kilometer.

"The power granted to the Board by Act No. 54 of 1962 to establish a limit to the kilometrage and/or tonnage of the cane, which should be considered to determine the maximum compensation which as a minimum may be paid to the *colonos*, constitutes the constitutional safeguard of the act.

"*Hence, § 6, without providing for a minimum-maximum in the compensation for transportation and hauling, is constitutionally inapplicable.* To correct its unconstitutionality the Board may fix a maximum with retroactive effect.

"...                                    ."

[5] Apparently, the executive veto was due to the retroactive effect to the 1963 and 1964 grinding seasons given to the aforementioned rule.

caused to them, but because, actually, it left to the exclusive discretion of the *colonos* the determination of the amount to be paid on that account, considering the obligation to grind their cane imposed by § 3 of the Sugar Act; and (b) the determination fixing a maximum limit was adopted in a quasi-judicial proceeding, although it was denominated Rule 11, for which reason the executive approval was unnecessary, and since it had not been challenged by the *colonos* it was still in force. They concluded requesting leave to appear to present evidence on the economic prejudice caused to them and that a reasonable term be granted to them to file a memorandum on the questions of law raised. On September 11, 1965, the centrals filed a written memorandum in support of the motion for reconsideration signed by Fernando Chardón, which discusses the economic impact caused by the decision of July 21, with an extensive information to support the aforementioned position that the compensation without maximum limit "binds the centrals to grind the cane with losses, since they are obliged to pay excessive transportation costs in cases of distant cane, precluding them, at the same time, from refusing to grind it." On October 7 they also requested (a) to enter in the record the decision of last February 26 as well as the stenographic record of the hearings which resulted in the adoption of Rule 11, and (b) that official notice be taken of the usage and custom in the industry, of executing grinding contracts for two or three years. Similar contentions were raised by Mario Mercado e Hijos, Land Authority, and Central San Vicente.

By decision of December 29, 1965, the reconsideration requested was denied.[6] Although the Board acknowledged that originally "it evaded the contention of unconstitutionality acquiescing to fix a limit in the maximum compen-

---

[6] The decision was adopted by the majority of the members of the Board; one of the associate members presented a dissenting vote.

sation," it maintained that "the arguments adduced by the centrals in support of their contentions have not convinced the Board that the order entered by the latter on July 21, 1965 ... had confiscatory, unreasonable, and arbitrary effects during the years of 1963 and 1964, which were the years subject to the application of said order."

The centrals appealed to us from this decision of the Board and from its refusal to reconsider, substantially reproducing the same contentions for challenge which they formulated before the Board.[7] Petitioners' position would be precarious if the decision of this appeal would depend exclusively on these contentions. As to the deprivation of property on the ground that the decision was confiscatory, see, *Eastern Sugar Associates* v. *Sugar Board*, 77 P.R.R. 354 (1954), aff'd in 235 F.2d 347 (1956), and cases cited therein; as to the nature of the order, see, *Eastern Sugar Associates* v. *Sugar Board*, 77 P.R.R. 354, 364-8 (1954) and *Godreau & Co.* v. *Public Service Comm'n*, 71 P.R.R. 608, 613-4 (1950).

## II

■ From the foregoing extensive recital of the proceedings it appears that the decision of the Sugar Board ordering the payment of compensation for transportation without any limitation whatsoever was due to the fact that, when Rule 11 was returned with the executive veto the Board understood that since the provision of subdivision (e) of § 6, which fixed the maximum of one dollar, had been eliminated the law mandatorily entailed such result. It considered that the legislative action vetoed every other course of action, although at all times it was aware of the constitutional problem this would raise. As it may be seen we need not consider the constitutional aspect, since the correct interpretation of

---

[7] A question of unconstitutionality was also presented because of undue delegation of powers, but in the oral hearing the same was abandoned.

all the situation leads us to the conclusion that the elimina-tion of the maximum of one dollar presupposes that the basic compensation of 15¢ and 5¢ which originally was fixed in 1951 by Act No. 426 be previously increased; and that the basic compensation for transportation and hauling having been maintained, the maximum limit of one dollar should be considered as in force for the grinding seasons of 1963 and 1964. In that sense we comply with our obligation to "avoid an interpretation of a statute which would lead to an unreasonable result." *Colonos de Santa Juana* v. *Sugar Board*, 77 P.R.R. 371, 374 (1954).

It is wise to repeat certain fundamental principles under-lying the approval of the Sugar Act. Vital historic, economic, and social factors required regulation of the industry in its manufacturing phase to avoid the existing economic imbal-ance which prejudiced the *colonos*; hence, the active interven-tion of the state to attain a balanced and serene equilibrium between the *colonos* and the centrals.[8] A necessary corollary is an orderly distribution of the costs and benefits between both, but "It could not have been the legislative intent that this Act should benefit the colonos to the point of affecting adversely the entire economy of the industry by imposing on centrals unreasonably burdensome obligations." *Arroyo Merino* v. *Sugar Board*, 89 P.R.R. 610, 625 (1963). In this case, in

---

[8] *Central Monserrate, Inc.* v. *Sugar Board*, 83 P.R.R. 105 (1961), in relation to the shipment and marketing expenses; *Plata Sugar Co.* v. *Sugar Board*, 82 P.R.R. 833 (1961), in relation to compensation for trans-portation and hauling; *South P.R. Sugar Co.* v. *Sugar Board; Mercado, Int.*, 82 P.R.R. 815 (1961), in relation to the freedom recognized to the *colonos* to shift the grinding of their cane; *Mayagüez Sugar Co.* v. *Sugar Board*, 78 P.R.R. 844 (1956), in relation to the delivery of cane of inferior varieties; *Colonos de Santa Juana* v. *Sugar Board*, 77 P.R.R. 371 (1954), in relation to providing free hoisting service to *colonos*; *Eastern Sugar Associates* v. *Sugar Board*, 77 P.R.R. 354 (1954), in relation to the liqui-dation of *colonos*' participation; *Eastern Sugar Associates* v. *Sugar Board*, 77 P.R.R. 339 (1954), on the designation of the point of delivery for the purpose of compensation for transportation; and *A. Roig, Sucrs.* v. *Sugar Board*, 77 P.R.R. 324 (1954), especially at pp. 330 to 334.

order to ascertain its true meaning and purposes § 6 cannot be read in an isolated fashion either, without having knowledge of the other provisions of the statute which form part of the general regulations to confront the problems and conditions of the industry. *A. Roig, Sucrs.* v. *Sugar Board*, 77 P.R.R. 324, 334 (1954). Never before do these principles apply with more force in view of the existing situation in the industry, which could be described as unsteady and in a wrecked condition.[9]

As it is stated in *A. Roig, Sucrs.* v. *Sugar Board, supra* at 337, the legislation, "generally speaking, followed the customs and historical pattern of the sugar industry in Puerto Rico in fixing the compensation, *including transportation and hauling expenses*, which the mills have been required to pay colonos." A reexamination of the aforecited laws only leads to the inescapable conclusion that in relation to the transportation and hauling of the cane a system has prevailed by which the centrals *have contributed*, but *have not totally paid* for the expenses which such activities cause to the *colono*. Thus, Act No. 112 of May 13, 1937 (Sess. Laws, p. 261) does not mention this matter specifically, and in its § 7 it merely provides that "The *colono* shall deliver his cane at the place and in the manner agreed upon with the central, and once accepted at such place, the central shall be responsible for said cane, as regards its transportation to the mill," obvious reference to the cane delivered by the *colonos* at the railroad sidings to be transported by loco-

---

[9] Special Message of Hon. Roberto Sánchez Vilella, Governor of Puerto Rico, of October 31, 1966, concerning Agriculture, to the Legislative Assembly, XX Journal of Proceedings 11 (1966); Act No. 1 of December 6, 1966 (Sp. Sess. Laws, p. 3), to provide a program of incentives and improvement of the sugar industry, especially the declaration of policy; *Informe sobre la Agricultura de Puerto Rico: Situación y Posibilidades,* 53-1 and 2 *Revista de Agricultura de Puerto Rico* 39–64 (1966); Sugar Producers' Association, Manual of Sugar Statistics (1967 ed.).

From 1952 up to now 15 centrals have ceased in their operation; at the present time only 18 are in operation.

motives to the mills. In 1938 by Act No. 213 of May 15 (Sess. Laws, p. 411) § 7 is amended to provide that the central "shall not make any deduction from the amounts *contributed . . .* to the *colono* for transportation by truck, oxcart, beasts of burden, or vehicle of any kind, *and the minimum rates to be used shall be those that prevailed during the grinding season of 1937.*" The practical effect was the incorporation of the rates that the usage and custom of the parties had developed up to that time. In 1942, as part of the program of a new government which adhered to an economic policy which considered the sugar centrals as public-service enterprises, and as such, they were subject to strict regulation by the State, Act No. 221 of May 12, 1942 (Sess. Laws, p. 1176) was approved, which does not contain any specific provision in relation to compensation for transportation and hauling. However, the Public Service Commission, an entity under whose jurisdiction the centrals were placed, under §§ 21 and 23 of said Act, fixed the amounts which for that account the centrals were bound to pay.[10]

---

[10] Below we copy extensively the pertinent part of § 12 of the General Regulations for the grinding season of 1943–44 to prove the permanency acquired by the compensation formula in question and to which recognition was given.

"Section 12.—The centrals shall be bound to pay to the *colonos* for transportation and hauling of the cane to the sugar mill, the following compensation rates, according to the methods specified for the transportation of cane to the sugar mills:

"1. *Direct transportation and hauling in the sugar mill:*

"(a) Trucks used by the *colonos* themselves and manually loaded within the plantation and transported to the sugar mill, *the basic rate of 15 cents plus 5¢ for each ton per kilometer from the farm to the mill.*

"(b) Ox-carts and tractor trucks, under the same circumstances of subdivision (a), *the basic rate of 15¢ plus 5¢ for each ton per kilometer,* provided the distance traveled is one (1) kilometer or more from the farm to the mill.

"(c) Wagons belonging to the central manually loaded within the plantation on portable tracks belonging to the central and transported by the central to a fixed track and from the fixed track to the mill; or wagons belonging to the central transported directly to the mill on portable tracks. No amount shall be paid for transportation and hauling. If said wagons

· These regulations did nothing but incorporate the pre-vailing practice, established by usage and customs: a basic rate of fifteen cents per ton of cane transported, as hauling expenses, plus the sum of five cents for each ton per kilometer, from the farm to the place of delivery, but with a maximum

and portable tracks should belong to the *colono* himself then the rate of *5¢ per ton* shall be paid.

"2. *Combined transportation and hauling to sugar mill:*

· "(a) Ox-carts belonging to or leased by the *colonos* from the plantation to a point within or near the farm, and manual or mechanical hoisting to trucks belonging to or leased by the *colonos* to transport the cane to the mill, or tractor trucks belonging to or leased by the *colonos* from the plantation to a plaza within or near the farm, and mechanical hoisting to trucks belonging to or leased by the *colonos* to transport it to the mill; the central will pay to the *colonos* on this account, *the basic rate of 15¢ plus 5¢ for each ton per kilometer.*

"(b) Ox-carts belonging to or leased by the *colonos* from the plantation to a siding belonging to the central, and manual or mechanical hoisting to carts or wagons belonging to the central to transport the cane from the siding to the mill; or tractor trucks or wagons belonging to or leased by the *colonos* from the plantation to a siding belonging to the central, and mechanical hoisting to wagons belonging to the central, to transport it from the siding to the mill: the central shall pay to the *colonos* on this account *the basic rate of 15¢ plus 5¢ for each ton per kilometer* provided the distance from the farm to the siding is one (1) kilometer or more.

"(c) Cane transported on horseback from the plantation to the plaza of the central and manual loading therein, *the basic 15¢ plus 5¢ for each ton per kilometer*, provided the distance traveled is one (1) kilometer or more.

"(d) Cane transported on horseback from the plantation to a siding of the central, and manual hoisting to wagons belonging to the central, and from the siding to the mill: *the basic rate of 15¢ plus 5¢ for each ton per kilometer*, provided the distance to the siding is one (1) kilometer or more.

"(e) Ox-carts, tractor trucks or wagons, from the plantation to a plaza or loading platform, mechanical hoisting to trucks belonging to or leased by the *colonos* to transport the cane to a common siding of the central, and mechanical hoisting in the siding to wagons belonging to the central for final transportation to the mill: *the basic rate of 15¢ plus 5¢ for each ton per kilometer*, provided the distance from the loading platform or plaza on the farm to the siding is more than (1) kilometer.

"(f) Ox-carts, belonging to or leased by the *colonos*, from the plantation to a barge on the river and hoisted manually or mechanically therefrom to wagons at a siding of the central and for transportation from

limit of one dollar. This is the same formula which, as we have seen, is statutorily adopted in § 6 of Act No. 426 of May 13, 1951 (Sess. Laws, p. 1138).[11]

■ It is thus inferred that the fixing of a maximum rate for transportation and hauling has always been an indispensable integral part in the formula of compensation, resulting from the practice of the central to contribute to, but not to pay in full, the expenses incurred by the *colono* on this account.[12] See, *Estación Experimental Agrícola, Estudio Económico Sobre el Arrastre de Caña de Azúcar en Camiones, Puerto Rico, 1954,* Bulletin No. 142 (1958) and An Economic Study of the Handling of Sugar Cane by Motor Trucks, Puerto Rico, 1948 and 1949, Bulletin No. 100 (1951).

This historical background leads us to consider the effect of the amendment introduced in 1962. Since 1951 the compensation had been established by the law itself, and, hence, it could only be altered by legislative action. Aware of the

---

the siding to the mill: *the basic rate of 15¢ plus 5¢ for each ton per kilometer,* provided the distance from the plantation to the siding is more than (1) kilometer.

"(g) Wagons belonging to the central from the plantation to the siding and mechanical hoisting to wagons of the central and from the siding to the mill: the central shall not compensate for transportation and hauling. If the wagons and tracks from the farm to the siding should belong to or were leased by the *colonos,* the central shall compensate the amount of *5¢ for each ton per kilometer,* provided the distance from the farm to the siding is one kilometer or more.

"*In all the other previous cases where the centrals are bound to pay the amounts indicated to the colonos on account of transportation and hauling, the central shall not pay to the colonos more than $1 in total, per ton including the basic rate of 15¢.*

"."

[11] Although in § 7 of the General Regulations for the Sugar Companies, approved on June 27, 1946, by the Public Service Commission, said entity retained the authority to determine the compensation, the truth is that the formula copied in the preceding footnote prevailed.

[12] When the law sought to impose on the centrals the full payment of certain services it so stated expressly, as for example, in the case of hoisting service. Section 6(a), 5 L.P.R.A. § 375.

rise in the costs for transportation from the time the original rate was adopted, the reevaluation of the situation as to the contribution of the centrals for the payment of such costs was imperative. But instead of fixing statutorily the amount to be paid, the question is left to an entity specialized on the matter which after a hearing of the parties, *may raise* the compensation fixed. See footnote 1, aforecited. In this respect the lawmaker carefully permitted the increase, but, immediately thereafter he authorized the Board to "fix the maximum amount that in each case the central shall be under obligation to pay for transportation and hauling," since in the event the basic amounts are increased the maximum of one dollar will necessarily disappear to be increased accordingly. One is a sequel of the other. Only if the basic amounts were increased would the maximum be increased. And as we have seen, the Board itself, after considering the situation as a whole by applying the proper standards—consideration of the total participation received by the *colono* for its sugar—did not consider that the petition for a raise was proper, and maintained the basic amounts contained in the traditional formula.[13]

The legislative actions subsequent to the original decision of the Board, of February 26, 1965—by which the increase of the basic amounts requested by the Farmers' Association in behalf of the *colonos* was denied, and the maximum of one dollar was maintained—tend to corroborate our interpretation. While Rule 11 was still pending executive action, House Bill No. 298, which later became Act No. 60 of June 19, 1965 (Sess. Laws, p. 119), was presented on March 11, 1965, and was approved by both houses on May 31, 1965. The act directed the Sugar Board to make a survey of the costs of hauling and delivery of cane since

---

[13] The practical effect of the order of the Board is to grant a windfall to a limited group of *colonos* who transport the cane a distance of more than 17 kms. from the point of delivery to the mill.

the beginning of the 1965 grinding season, and taking into consideration the results of that survey, the participation of the *colonos* in other items, and the capacity for payment of the centrals, to fix fair and reasonable compensations for the hauling and delivery of cane *and the maximum amount* to be paid therefor by the centrals to the *colonos* from the beginning of the 1965 grinding season.[14] So we see how the Legislature once more reiterated the necessity of fixing a maximum limit.

■ Even more eloquent is the action of the Board itself. Under the authority granted by the aforementioned Act it adopted, on June 17, 1966, Rule No. 12, which was approved by the Governor on July 29, 1966, 5 R.&R.P.R. §§ 386–1 to 386–10,[15] and which if examined actually left unaltered the traditional maximum of one dollar up to the distance of 17 kilometers—in *Plata Sugar Co.* v. *Sugar Board*, 82 P.R.R. 833, 840 (1961), we said that: "As the legal compensation per ton is fifteen cents for hauling and five cents per kilometer for delivery, the maximum of one dollar tends to discourage the delivery of cane to be ground to a central when the point of delivery is more than seventeen kilometers away from the farm of origin"—and only increased the maximum by twenty-eight cents, up to $1.28 to cover the increase

---

[14] In the report of the House Committee on Agriculture, 19 Journal of Proceedings 1721, reference is made to the changes which have taken place in agriculture—the exodus of farm workers, the collective emigration of the working population to the United States, the military enlistment, the dramatic increase in transportation cost, the time lost in the turns to unload the trucks of cane—and it is stated that "the compensation received by the *colonos* for the transportation and hauling has been jurisprudentially acknowledged as part of the participation that the *colonos* receive for the proceeds of their cane . . . ."

[15] The following amounts are fixed according to the hauling distance: (1) less than one-half kilometer, 15 cents; (2) from ½ kilometer to 6 kilometers, 50 cents; (3) from 7 kilometers to 16 kilometers, 50 cents plus 5 cents for each kilometer in excess of six kilometers; (4) from 17 kilometers to 30 kilometers, $1 plus 2 cents for each kilometer in excess of 16 kilometers; (5) 30 kilometers or more, $1.28.

ordered in the basic amount at the rate of two cents per kilometer when the distance covered was between seventeen and thirty kilometers. These fourteen additional kilometers which are now compensated, not at the rate of five but of two cents per kilometer, required, in turn, the readjustment of the maximum limit correspondingly, to $1.28. We therefore ratify our interpretation that the effect of Act No. 54 of June 19, 1962, was not to establish a compensation without a maximum limit, but rather that for the elimination of the one-dollar limit, which until then was fixed by the statute, an affirmative action was required increasing the basic amounts.

By virtue of the foregoing it is not necessary to consider the other contentions raised by petitioners. Having no legal basis the decision of the Sugar Board of July 21, 1965, is hereby set aside and the cancellation and return of the supersedeas bonds furnished by the petitioner centrals is ordered.